## THE GOOD NEWS.

### REILLY v. TUOHY & UPTON, Inc.

(District Court, E. D. New York. April 6, 1921.)

**Wharves** ⊂⇒20(3)—**Owner held liable for injuries to barge occasioned by change of berth bottom from dumping of coal and rocks.**

The owner of a wharf at which the depth was insufficient to float barges at low tide is liable to a barge injured in the berth by straining of her timbers, caused by rock and coal on the bottom which had been dropped there at intervals, though the bottom had previously been soft, so that a barge could safely lie thereon, and no barge had previously complained of receiving injuries while in that berth.

In Admiralty. Libel by Edward J. Reilly, as owner of the barge Good News, against Tuohy & Upton, Incorporated. Decree rendered for libelant.

Macklin, Brown, Purdy & Van Wyck and W. F. Purdy, of New York City, of counsel, for libelant.

William Rasquin, Jr., of New York City, for respondent.

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

CHATFIELD, District Judge. The charge of damage depends upon a comparatively slight physical unevenness, or upon the constituents of the river's bottom forming the berth just outside, or to the north, of the highway bridge in Flushing creek, at a point where substantially but one loading berth is usable, because of the presence of a crane required in unloading the cargoes. The barge Good News, which is of moderate size, drawing some 9 feet of water when loaded, came in to the dock late on Saturday afternoon, and found another barge, the Murphy, with a draft of about 12 feet when loaded, lying in the berth at the dock. The Good News was moored alongside of the Murphy, and the tugboat left. The captain of the Good News disclaims all knowledge of the exact position of the Murphy with reference to the face of the dock, and states that he remained on his barge without crossing the Murphy until Monday morning, when he reported his arrival, and after the removal of the Murphy he pulled in alongside of the dock. At that time he testifies that the engineer of the crane warned him to breast off about 10 feet to avoid the bank at the foot of the cribwork upon which the Murphy had been resting. He did so breast off, and at the next low tide found that his boat had twisted, so that her seams were open, and so that she made water, requiring careful pumping until unloaded and she could be taken to dry dock.

Surveys, showing the depth of water while the Murphy was still in the slip and before the shifting of the Good News, indicate a somewhat uneven bottom. The engineer who made the surveys testifies that the character of the bottom was also variable, having been originally soft mud, but having been changed in spots by the continual dropping of coal and stone; while the captain of the barge testifies that he found deposits of sand and stone to such an extent that he determined the berth to have a hard bottom underneath the top layer of mud. The owners of the dock have introduced a survey showing in general, a more even bottom, while in some places they show less depth and in others more; the figures of those surveys covering a period from the years 1915 to 1921, the 1921 figures being taken a few days after the occurrences in question. The owners' soundings were made by forcing a rod down into the soft mud. The surveys of the libelant's captain and of the engineer who made the blueprint were made either with a pike pole in the case of the captain, or a lead in the case of the engineer. It is evident that the pike pole would disclose more as to the presence of hard material or hard lumps under the mud than would the soundings by lead.

The case does not seem to be one where there was an accidental or temporary obstruction by some object which lifted one corner of the boat, and the straining occurred without any greatly exaggerated change in level. From the testimony it would appear that the character of the bottom had more to do with the twisting of the boat than did the precise depth of water. Boats have been lying at this wharf and resting on the bottom at low tide for many years. No other cases of damage have been reported. The libelant had previously sent boats to this berth, which must have lain on the bottom, without having received any injury therefrom, and the only question in the case, therefore, is

whether the owners of the dock are responsible for failure to appreciate the gradual change in the condition of the bottom of the berth, which may in a particular instance cause damage, even though that injury be avoided by hundreds of boats of either different dimensions or different draft.

The testimony of the libelant's captain is credible. There is apparently no dispute that the boat received some injury from straining, and I think that the libelant makes out a case of responsibility for the condition of the berth maintained by those who have knowledge that boats must rest on the bottom, in positions where sounding by the captain at the time the boat is brought into the berth would not disclose any avoidable injury, and where the owners have for a long period of time allowed the berth to become dangerous.

I think the libelant must have a decree.